748 So.2d 622 (1999)
STATE of Louisiana
v.
George GILLIAM.
No. 98-KA-1320.
Court of Appeal of Louisiana, Fourth Circuit.
December 15, 1999.
Rehearing Denied January 14, 2000.
*625 Harry F. Connick, District Attorney of Orleans Parish, John Jerry Glas, Assistant District Attorney, Cate L. Bartholomew, Assistant District Attorney, New Orleans, LA, Counsel for Plaintiff.
R. Neal Walker, Louisiana Crisis Assistance Center, New Orleans, LA, Counsel for Defendant.
Court composed of Judge MIRIAM G. WALTZER, Judge PATRICIA RIVET MURRAY and Judge ROBERT A. KATZ.
WALTZER, Judge.
Appellant, George Gilliam, appeals his conviction for second degree murder, a violation of LSA-R.S.14:30.1. He assigns several errors, principally among them the introduction of two incriminating statements he made after detention by the police and/or while in prison awaiting trial. Gilliam asserts that without the erroneous admission of these statements, he would not have been convicted and now be compelled to serve a life sentence without probation, suspension or parole.
Having found the errors below to have been harmless, we affirm Gilliam's conviction and sentence.

PROCEDURAL BACKGROUND
It is important to understand the sequence of events in this case, especially as it pertains to the chronological history of the defendant's case. The defendant was 16 years old at the time of his arrest. He and his brother, Weldon Williams, a former New Orleans police officer, were charged by grand jury indictment with the crime of first degree murder while in the perpetration or attempted perpetration of second degree kidnapping, and/or with the intent to kill or inflict great bodily harm on more than one person. Both Gilliam and Williams were represented by attorneys of the Orleans Indigent Defender Program (O.I.D.P.). The court on 21 June 1994 appointed Jeffrey Smith, Esq., of the O.I.D.P. to represent Gilliam. Clyde Merritt, Esq., of the O.I.D.P. was appointed to represent Weldon Williams on 28 June 1994. On 7 July 1994 the trial court relieved O.I.D.P. of Gilliam's representation. R. Neal Walker, Esq., was appointed by letter of 11 July 1994 to represent Gilliam and Walker signed the record on 20 July 1994. Gilliam's attorney filed numerous motions, among them a motion alleging that Gilliam could not be subjected to the death penalty because of his age. On 24 June 1996 the entire case was transferred to the Honorable Charles Ward, Judge ad hoc, for hearing on motions and trial. On 5 August 1996 the prosecution announced that it would try Weldon Williams first.[1] On 15 August 1996 the bill of indictment was amended to charge Gilliam with second degree murder. The first trial of Williams resulted in a mistrial. In Williams' second trial on 9 March 1997, Williams was convicted of first degree murder, without capital punishment. In a jury trial on 3, 4, 5, and 6 November 1997, a 12 person jury found Gilliam guilty as charged. Gilliam's motion for a new trial was denied, and Gilliam was sentenced to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence.

BACKGROUND FACTS
Larry Montgomery, a security guard at Dixon Welding, testified that on 23 April 1994, at 1:00 a.m., he was making the rounds of the isolated facility. He saw a white car with its headlights on, parked near one of the gates. He saw two men searching with flashlights, one of whom he thought was white. He spoke to them briefly. Then they got into the car and backed away quickly. He later heard loud noises, noticed that a door to a trailer had been pried open, and called police. He *626 saw a young black male, who had been shot, inside the trailer.
Matthew Morgan of the Plaquemines Parish Sheriff's Office answered the call because the site was on the parish line. He spoke with Montgomery and proceeded with other deputies to the trailer where Willard Storey, from inside the trailer, said he and his friend had been shot. Morgan found the body of Mitchell Caesar in the grass of a nearby field, and notified New Orleans police.
Captain Charles Bowles of the Plaquemines Parish Sheriff's Office also answered the call. He said that Storey was on the floor of the trailer and told him that he had been shot by a policeman and the policeman's brother.
Officer Peter Curdrado arrived at the scene and collected casings.
Officer Gary Marchese, NOPD, arrived on the scene and spoke to Montgomery and Bowles. From the investigation on the scene, the officers could tell that two weapons had been used: a nine millimeter handgun and a thirty-eight caliber automatic weapon. Marchese went to JoEllen Smith Hospital and then to Charity Hospital where Storey had been taken. Marchese took a taped statement from Storey. He learned that George Gilliam, whom Storey knew, was a suspect, along with a New Orleans Police officer who was Gilliam's brother. He prepared a photographic lineup, and Storey chose a picture of Gilliam's brother, Weldon Williams. Marchese prepared an arrest warrant for Williams. The white car, belonging to Weldon Williams, was found at a body shop. Search warrants were executed on the car and Williams' apartment. Marchese recovered a nine millimeter handgun from Williams at the time of his arrest. A search of Williams' residence revealed elements of Williams' police uniform, nine millimeter Black Talon ammunition, and nine millimeter ammunition. Marchese said that a copper jacketed lead pellet, two Winchester thirty-eight super casings and two Winchester nine millimeter casings were recovered at the scene. Detective Carlton Lawless went to the scene during the daytime of 26 April 1994, and found three spent nine millimeter Winchester casings, one spent F-C nine millimeter casing, a spent copper-jacketed lead pellet, and a set of keys. In all, six nine millimeter casings were recovered, and two thirty eight caliber casings. Officer Peter Curdrado arrived at the scene and collected casings.
Dr. William P. Newman, pathologist, testified that the victim Mitchell Caesar had been shot six times. Four bullets were recovered from the body. There was no evidence of alcohol or drugs.
Officer John Treadaway, a firearms examiner, testified that the nine millimeter bullets were fired from one gun, and the thirty-eight caliber bullets from another. The thirty-eight caliber bullets did not match the rifling characteristics of bullets fired from the gun recovered from Williams; however, the nine millimeter bullets did match.
Captain Steven Nicholas took the stand and said that he took a statement from Gilliam on 26 April 1994. On that day, Gilliam turned himself in, accompanied by his mother, at approximately 8:39 a.m. Also present during the taking of the statement were Lieutenant Italiano, Sergeant Randolph of the Juvenile Division, and the defendant's mother, Irma Gilliam. The tape was played for the jury. Nicholas testified that the defendant's Miranda rights were protected, and that the defendant and his mother were not threatened.
Italiano testified that the defendant, Officer Randolph and Irma Gilliam had signed a Waiver of Rights of Arrestee Form. He said neither the defendant nor his mother were threatened, and that the defendant was advised before he gave the statement that he would be arrested for murder. The recorded statement was begun at 10:31 a.m. When Gilliam and his mother were asked whether there was anything the police could get either one of *627 them before the statement began, Gilliam answered:
A. I can get a lawyer now?
Q: I'm sorry?
A. I can get a lawyer now?
Q. You can get a lawyer if you want a lawyer. Do you want a lawyer?
A. Yea, can I get one now?
Q. Do you want a lawyer now? o.k.
A. Inaudible.
According to Captain Nicholas the interrogation was stopped at 10:34 a.m. Captain Nicholas further testified that Gilliam and his mother were left alone, presumably to discuss the next step in the interrogation. Meanwhile, Captain Nicholas called the District Attorney's office for guidance, since the accused had requested counsel. The statement reflects that Captain Nicholas noted at 10:38 a.m., four minutes after the cessation of the statement:
THE TIME IS NOW 10:38 AM, SAME DATE, APRIL 26. WE CONCLUDED THE STATEMENT AFTER A REQUEST BY THE DEFENDANT FOR AN ATTORNEY. AFTER WE CONCLUDED THE STATEMENT, THE DEFENDANT REQUESTED TO GO ON WITH THE INTERVIEW NOT REALIZING THAT WE DIDN'T HAVE ANY ATTORNEY PRESENT IN THE OFFICE (emphasis supplied).
Q. Is it your wish to give us this statement without an attorney present, George?
A. Yes
Q. You do understand that you do not have to give us this statement?
A. Yes
Q. Mrs. Gilliam, do you understand that your son does not have to give us this statement as we do not have an attorney available. We can stop the statement right now. Nothing will change. We can either go on with the statement as he is going now, as he wants to, or he can stop.
A. We want to go with the statement.
Gilliam then gave a statement incriminating his brother and himself, admitting that he had forcibly picked up Caesar and Storey to take them to a deserted field because of an alleged burglary by Storey of Gilliam's apartment. He further stated to the police that he had a gun in his waistband, drove with Williams in a white Cougar, and was present when Mitchell Caesar was executed. He also admitted that he and his brother looked with flashlights to find the second victim, Willard Storey. According to the statement, Gilliam fired into the ground, while Williams made Caesar get on his knees and shot him eleven or twelve times. The statement was concluded at 11:08 a.m.
Detective John Ronquillo said that he went with the defendant to two locations, including the home of Gail Bass, to search for a weapon, an automatic "super thirty-eight", but he found no gun.
Cicero Patterson, a former investigator for the O.I.D.P, testified that he went to the prison where the defendant was being held and told him:
We were representing both defendants, he and his codefendant, but at that time we could not defend both of them. So my office represented the codefendant in this case, and he agreed to go ahead and talk to me. I told him he didn't have to talk to me if he didn't want to.
The defendant gave a statement to Patterson which was read into the record.
On cross examination, Patterson said that he knew it was improper for a lawyer representing one defendant to go to another defendant in the same case to take a statement from him if he knew that the other defendant was represented by independent counsel. He said, however, that he did not know the defendant was represented by a lawyer. According to Patterson's testimony, Gilliam asked him whether anyone would get a copy of the statement and Patterson responded that the copy would go straight into the *628 file of Mr. Merritt, who represented Weldon Williams.
Patricia Metoyer said that she was Caesar's sister, that he had lived with her, that he had moved out because he did not get along with her husband, and that he had moved in with her neighbor, Veronica North.
Storey's mother, Veronica North, confirmed his nickname was Slugger and said that Mitchell Caesar was like a "foster son" who lived with her. She last saw Storey and Caesar at 1:30 a.m. on the Saturday of the crimes.
Storey took the stand and stated that he and Caesar were packing for a move. A woman came by and gave him a telephone. Later, the defendant knocked on the window and asked if Storey had his telephone. Storey said that he did, and the defendant said that he would return. He soon returned and asked Storey to come outside to see something. Caesar followed. Outside, a white car with black stripes was parked. Williams was in the driver's seat; Storey did not know his name at the time. Williams started waving a gun and told Storey to get in the car. Storey did not see Gilliam with a gun at this point. Williams opened the door of the two-door car, and Storey got in the back. Caesar got in the back also, from the passenger side. At that point, Gilliam put something under the seat which Storey assumed was a gun. Storey remembered that Williams was wearing dark pants with a stripe on the side. Gilliam and Williams began commonly referring to their "mama" in a conversation. Williams drove a distance and arrived at a dirt road blocked by a wire. He got out of the car, lowered the wire, and drove into a field. He stopped the car. Storey saw that Williams was wearing a utility belt. Williams ordered Storey to get out and lie face down on the ground. Storey complied. Gilliam ordered Caesar to do the same. Then Gilliam said, "Let's do this." Williams shot Storey twice. Storey lunged at him, and Gilliam then shot him in the leg. Storey ran. He heard Caesar scream, and then he heard more shots that were coming from more than one gun. After the shots stopped, Gilliam and Williams started the car and tried to run him over. Gilliam got out of the car, and Storey ran to a ditch. Gilliam stood over him trying to shoot him, but the gun seemed jammed. Gilliam returned to the car and came back with a different gun, looking for Storey, but could not find him. Gilliam started calling Storey's name saying that they were going to take him to the hospital. Both Gilliam and Williams then came looking for him with flashlights but could not find him. Storey crawled in the ditch. He could hear the men cursing. Eventually, Storey pried open the door of a trailer and hid inside. Soon, he heard a police officer on a loudspeaker ordering him to come out with his hands up or else dogs would be released. He could not respond because of his injuries. The officers came into the trailer and asked who had shot him, and he responded that "George Gilliam" had. At the hospital, he told Marchese he did not know Williams' name although he thought it was Waylon or Eldon. He identified Williams in a photographic lineup. He gave the officers Gilliam's address and telephone number.
The prosecution then rested.
Gail Bass, Gilliam's former neighbor, testified for the defense that she called Gilliam on the night of the crime and told him that someone was breaking into his apartment. Gilliam came over, and after a discussion, Gilliam assumed "Slugger" had been near the apartment.
Gilliam's mother took the stand and said that she took her son to the police station after her daughter told her that she had heard on the news that he was wanted. She said that the officers told them that Williams was wanted for the crime, and that they only needed to ask Gilliam a few questions. They told her that Gilliam did not need a lawyer. She said she did not read the Rights of Arrestee Form before signing it.

*629 ASSIGNMENT OF ERROR NO. 1: The admission of the inculpatory statement given while at police headquarters.
Gilliam gave an inculpatory statement on 26 April 1994. His attorney moved to suppress the confession. Testimony was heard on 18 November 1994 and on 19 December 1995. On 18 February 1996, the trial court denied the motion. The defendant took writs to this Court which were denied. Even though this Court has already addressed the merits of the argument presented, an appellate court's prior determination of admissibility on a pre-trial writ does not absolutely preclude a different decision on appeal. State v. Carey, 609 So.2d 897 (La.App. 4 Cir.1992). In reviewing a ruling on a pretrial motion, an appellate court may consider not only the evidence presented at the motion hearing, but also the evidence adduced at trial. State v. Johnson, 557 So.2d 1030 (La.App. 4 Cir.1990).
Three police officers testified at the suppression hearings. Officer Italiano of the Homicide Division testified at the 18 November 1994 hearing that on 26 April 1994 he, Officer Nicholas, and a juvenile officer, Elmon Randolph, took defendant's statement in the presence of the defendant's mother. Officer Italiano testified that defendant was advised of his right to remain silent, that anything he said could and would be used against him at trial, that he had a right to an attorney, and that if he could not afford an attorney, one would be provided for him. The defendant was given the opportunity to discuss the waiver of rights with his mother and signed the Rights of Arrestee Form indicating that he understood his rights and wished to waive them. The form was signed as witnessed by all three police officers and the defendant's mother.
The transcription of the taped confession reflects that it began at 10:31 a.m. The actual interrogation was done by Officer Nicolas. He read from the Rights of Arrestee form and asked the defendant if he understood the form, to which the defendant answered yes. The record also reflects that the defendant's mother, Irma Gilliam, was present and that she understood her son's rights. The transcript of the tape further indicates that the defendant had made a statement "in a verbal format"; (presumably an oral statement made before the formal statement was recorded and typed); the defendant was then asked if it was his wish "to continue being cooperative" and waive his right to remain silent. The defendant again answered affirmatively, as did his mother. The defendant was then asked to sign the rights form indicating that he was waiving his rights, notably the right against self-incrimination.
Before interrogating the defendant, Nicolas asked the defendant and his mother if he could get either one of them anything before the statement began. At that point, the defendant asked "I can get a lawyer now?" Nicolas replied that the defendant could get a lawyer now if he wanted one. He asked the defendant, "Do you want a lawyer?"; the defendant responded, "Yea, can I get one now?" Nicolas terminated the taping at 10:34 a.m., three minutes after the tape had begun.
Four minutes later, at 10:38 a.m., the tape was started again. Officer Nicolas asked the defendant if it was his wish to give the police a statement without an attorney present; the defendant stated that it was. The defendant was asked if he understood that he did not have to give a statement and again answered affirmatively. The defendant's mother was also questioned as to whether she understood that her son did not have to give the statement "as we [the police] do not have an attorney available". Mrs. Gilliam indicated that they wanted to go on with the statement.
Officer Italiano testified that when the defendant stated he wanted a lawyer, the statement was immediately terminated. The defendant then indicated that he wished to go on with the statement. According *630 to Officer Italiano, the defendant explained that he thought that if he waived counsel, then he would not be able to have an attorney when he went to court. Officer Italiano further testified that in the four minute interval when the tape was turned off, the defendant and his mother were given total privacy to discuss matters, and the district attorney's office was contacted for advice.
Officer Nicolas testified at the 19 December 1995 hearing that the defendant's request for an attorney was for the purpose of his court appearances. When Officer Nicholas stopped the statement, he was asked why he was stopping it. He explained to the defendant that because the defendant made it clear that he wanted an attorney and there was no attorney present, the statement had to be stopped. The defendant then told the officers that he did not want the statement to stop; he wanted it to continue. Officer Nicolas confirmed Officer Italiano's testimony that the officers left the room, giving the defendant and his mother a chance to talk privately, and that the district attorney's office was consulted.
On cross-examination, Officer Nicolas was asked about a paragraph which appeared in the transcription of the tape. That paragraph states:
THE TIME NOW IS 10:38 AM.; SAME DATE, APRIL 26. WE CONCLUDED THE STATEMENT AFTER A REQUEST BY THE DEFENDANT FOR AN ATTORNEY. AFTER WE CONCLUDED THE STATEMENT, THE DEFENDANT REQUESTED TO GO ON WITH THE INTERVIEW NOT REALIZING THAT WE DIDN'T HAVE ANY ATTORNEY PRESENT IN THE OFFICE.
Officer Nicolas was unable to recall if the paragraph was actually on the tape or if it was simply something that he inserted when he personally transcribed the tape.[2]
Officer Randolph of the Juvenile Division confirmed the foregoing testimonies regarding the defendant's request for counsel for the purpose of court and his subsequent waiver of the right to counsel for the statement.
In State v. Hohn, 95-2612, p. 4 (La.App. 4 Cir. 1/19/96), 668 So.2d 454, 456-457, this Court reaffirmed the test for admissibility of a statement by stating that the prosecution has the burden of proving that a statement given by the defendant was freely and voluntarily given, not the product of threats, promises, coercion, intimidation, or physical abuse. LSA-R.S.15:451.
In State v. Abadie, 612 So.2d 1, 4-5 (La.1993), cert. denied, Louisiana v. Abadie, 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993), the Louisiana Supreme Court reviewed and discussed the defendant's Miranda right to counsel and his right to have counsel present during questioning, noting that if a suspect indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. The Court's later cases did not abandon that view.
In Minnick v. Mississippi, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), the Court confirmed that the rule of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) bars police-initiated interrogation unless the accused has counsel with him at the time of questioning. The Court held that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney. Minnick, supra, 498 U.S. at 153-54, 111 S.Ct. at 491.
In the instant case, the trial court gave a lengthy summary of its reasons for the denial of the motion to suppress:
The statement made by the defendant is true. The statement made by the defendant was not in any way forced. *631 What we're talking about, though, is our desire to be sure that every individual arrested is afforded what we believe the Constitution demands. Now, this is all what this is about, but it is not about an individual who is in essence forced to say something against his will.... When you look at the totality of what happened here, the fact that the defendant was present in the room with his mother; the officers are present; they are recording what's said, there's no statement made by either the defendant or mother that any statements made by the officers are not true in terms of the manner in which this happened. Mama and defendant both by their silence on this issue in essence attest to the fact that the officer's (sic) version of what took place is true. So when you look at that and you look at all of what happened, the officers tell him what his rights are. The officers tell his mother what his rights are. The officers give him and his mother an opportunity to talk about it and discuss it in terms of what they want to do. He then says, I want a lawyer. They say, okay, fine. They stop talking to him. Then he, and this of course, is the questionable aspect of this and I grant the Defense that it is somewhat questionable in terms of how the rest of this takes place; that is, whether or not he initiates it or whether or not the officers initiate it and whether the officers should have taken another course based on what had transpired. But still when you add it all up, it just seems to this Court the statement made by Mr. Gilliam should be a statement that can, in fact, be used against him. Because even though he may not have been given the letter of the law in terms of what his rights are and how those rights apply to him, it seems to me, though, he was given a clear indication by those officers of what course he could take and he decided to take this one [give the statement].
There is no question that this case presents a close factual and legal issue. Although the trial court accepted the officers' unrebutted testimony as to what happened in the four-minute interval between the defendant's unequivocal request for an attorney and the resumption of the taped statement, we find that the statement should have been excluded. The trial court's finding that the statement in and of itself was true and not "forced" is irrelevant under the applicable jurisprudence. The question is whether the defendant can be deemed to have "initiated" further communication with the police immediately after unequivocally stating that he wanted a lawyer "now". Gilliam asked for a lawyer at least three times during the taking of this statement. The alleged request by Gilliam to continue the questioning came within four minutes of the cessation of questioning. A request for counsel followed quickly by a waiver suggests confusion at best, especially when accompanied by confusing warnings. Here that possibility became even more pronounced, when the accused was told a few minutes later that there was no counsel available. Additionally, it seems clear that Gilliam was confused as to whether failure to waive his right to counsel at the statement level would adversely affect his right to counsel at forthcoming court proceedings.
Generally, a lack of a time lapse between the invocation of constitutional rights and a subsequent waiver tends to show that the police did not honor the defendant's rights. Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); State v. Hohn, supra, 95-2612 at p. 7, 668 So.2d at 459. However, an initiation of communication by the defendant can be in the form of a general question. In Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the defendant invoked his right to counsel at which time the police terminated the conversation. Later, on the way from the police station to the county jail, the defendant asked the police officer what was going to happen to him next. The officer *632 immediately advised the defendant that he did not have to say anything because he had requested an attorney. The defendant indicated that he understood. A general discussion followed as to where the defendant was going and with what he would be charged. The transporting officer then suggested that the defendant might help himself by taking a polygraph. The defendant agreed. The next day, after being advised of his rights and executing a written waiver, the polygraph was administered. The defendant admitted guilt shortly thereafter when the examiner told defendant that he appeared to be lying. The trial court denied the defendant's subsequent motion to suppress the confession; the Oregon appellate court reversed. On review, the Supreme Court found that the Oregon court had misapplied Edwards:
We did not there hold that the "initiation" of a conversation by a defendant such as respondent would amount to a waiver of a previously invoked right to counsel; we held that after the right to counsel had been asserted by an accused, further interrogation of the accused should not take place "unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S., at 485, 101 S.Ct., at 1885. This was in effect a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in Edwards was....
But even if a conversation taking place after the accused has "expressed his desire to deal with the police only through counsel," is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation.
Oregon v. Bradshaw, 462 U.S. at 1044, 103 S.Ct. at 2834. Under Bradshaw, the question posed by the defendant in this case, "Why are you turning off the tape?", appears to constitute initiation of a further conversation after having invoked the right to counsel. The prosecution now has the burden of proving that, after he initiated conversation, the defendant made a valid waiver of counsel, "that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." Oregon v. Bradshaw, supra, 462 U.S. at 1045, 103 S.Ct. at 2834, quoting footnote 9, Edwards, 451 U.S. at 486, 101 S.Ct. at 1885, [emphasis in original.]
In State v. Coston, 98-0470, p. 8 (La. App. 4 Cir. 9/16/98), 720 So.2d 714, 719, writ denied 98-2803 (La.11/24/98), 729 So.2d 565 this Court found that the State had not met its burden when the defendant had asked about having a lawyer present:
Notably, the detective's immediate response to this audio taped inquiry was to explain that an attorney could not be appointed because the courts were closed, followed by additional questions concerning the identity of a specific attorney "that will come in to represent you." Even if unintentional, this colloquy creates the impression that unless Mr. Coston knew of an attorney available at that hour, he was not entitled to have one present for the interview.
In the instant case, it is doubtful that the State met its burden. The defendant was asked if it was his wish to give the statement without an attorney present and if he understood that he did not have to give a statement. His mother was asked if she understood that her son did not have to give the statement "as we [the police] do not have an attorney available." This question was consistent with the officers' testimony that they informed the defendant that they could not provide him with counsel because none was present at the police station. The unavailability of counsel *633 could have caused the defendant to waive his right to counsel; the clear inference from the facts is that had counsel been available, defendant would have continued to request that counsel be present for the statement. Thus, it was not completely clear that the waiver was knowing, intelligent, and voluntary.
Gilliam was not even afforded a phone call in order to attempt to reach an attorney, rather, the detectives called the District Attorney's office in order to get advice how they should proceed, now that Gilliam had invoked his right to counsel. Considering that the accused came on his own to the police station in the morning at approximately 8:30 a.m., it would not have been impossible for him to contact the O.I.D.P., if at least he had been offered a phone call and a phone book to contact an attorney. This was not an impossible task; this was not a late night field interrogation. What happened during the few minutes of interrogation of the defendant and his request for an attorney and the swift resumption of the interrogation belies a good faith effort of the police to honor the sixteen-year-old defendant's Fifth and Sixth Amendment rights.
Moreover, it appears the defendant may have given an oral statement prior to the taped statement. Nowhere in the transcript or record before this Court is there any indication that the defendant was (1) given his rights prior to making the oral statement, or (2) waived those rights. The record does show that he did not execute the written waiver of rights form until the taped statement began, at which point he asked, "Can I have an attorney now?" Furthermore, at the commencement of the tape, the defendant was asked if it was his "wish to continue being cooperative and waive your right to remain silent." Considering that the defendant was a sixteen-year-old, the pressure to "continue being cooperative," after having made a statement without waiving his rights at least in writing, may have been overwhelming. The lack of a significant time lapse between the request for counsel and the waiver of the right to the assistance of such counsel, solely because counsel was unavailable at the time, again indicates that the defendant's waiver was invalid.
We specifically disapprove of the common practice of "softening up" an accused prior to formal questioning and the "informal chats" or "prefatory discussions" with the accused prior to the most incriminating statements. In the instant case almost two hours elapsed between the informal statements and the taping thereof. This practice is questionable because "all the careful safeguards erected around the giving of testimony, whether by an accused or any other witness, would become empty formalities in a procedure where the most compelling possible evidence of guilt, a confession, would have been obtained already at the unsupervised pleasure of the police." Mapp v. Ohio, 367 U.S. 643, 685, 81 S.Ct. 1684, 1707-08, 6 L.Ed.2d 1081 (1961), Harlan, J., dissenting. We have no record of the verbal statement and of the preliminary questioning leading up to that statement on which to base a determination of whether Gilliam's apparent confusion about the availability of an attorney at trial or at the time of the statement was or was not brought about or encouraged by the preliminary questioning. The importance of this question is amplified by the short interval between the cessation of questioning and Gilliam's prompt willingness to proceed with continued questioning.
The prosecution has the duty to establish that there was a valid waiver of the defendant's Fifth and Sixth Amendment rights to counsel. Where an interrogation is conducted without the presence of an attorney and a statement is taken, a heavy burden rests on the prosecution to demonstrate that the defendant knowingly and intelligently waived his rights. More than 60 years ago the United States Supreme Court instructed that we should "indulge every reasonable presumption against waiver of fundamental constitutional *634 rights." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Just as written waivers are insufficient to justify police-initiated interrogations after the request for counsel in a Fifth Amendment analysis, so too they are insufficient to justify police-initiated interrogations after the request for counsel in a Sixth Amendment analysis. To protect the privilege against self-incrimination guaranteed by the Fifth Amendment, the police must terminate interrogation of an accused in custody if the accused requests the assistance of counsel. Miranda v. Arizona, 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966); Minnick v. Mississippi, supra, 498 U.S. at 153, 111 S.Ct. at 491; State v. Abadie, supra. Once an accused has expressed his desire to deal with law enforcement officials only through counsel, he is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police. Edwards v. Arizona, supra, 451 U.S. at 484-85, 101 S.Ct. at 1884-85.
After the interrogator stopped the questioning and then commenced again, he wrote that: "After we concluded the statement, the defendant requested to go on with the interview not realizing that we didn't have an attorney present in the office." Officer Nicholas was unable to explain why he had written the above quoted sentence. The prosecution asserts that the defendant lived on his own and held down a job and was well able to understand the system. To simply assess the knowledge about the system the defendant may have possessed, based on information as to his age, education, intelligence, or prior contact with the authorities, can never be more than speculation. A warning and the honoring of the accused's request for counsel has to be clearly established. Here is only ambiguity as to whether Gilliam's waiver of his Fifth and Sixth Amendment rights was intelligent and knowing. The warnings given here and the explanations as to his right to counsel were not an effective and express explanation; to the contrary, they were equivocal and ambiguous. In one breath the defendant was informed that he had the right to counsel during questioning, in the next breath he was told that counsel could not be provided now (but perhaps at trial?). The message conveyed was that an indigent is first entitled to counsel upon an appearance in court at some unknown, future time. The entire warning is, therefore, at best misleading and confusing, and at worst, constitutes a subtle temptation to the unsophisticated, juvenile indigent accused to forego the right to counsel at this critical moment. While we give great deference to the trial court's ruling, we believe that in this case of a juvenile defendant accused of murder, the serious questions concerning the validity of his statement should be resolved against its voluntariness.
But even though the confession should have been excluded, its inclusion was harmless error. There was more than sufficient eye witness testimony presented to identify the defendant as an active participant in the kidnapping and execution of Mitchell Caesar and the attempted murder of Storey. Without Gilliam's erroneously admitted statement, he would still have been convicted on Storey's dramatic evidence. An error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In this case, the jury was presented with the testimony of Storey, a victim and an eyewitness to the crime who in fact knew Gilliam and was his near neighbor. Storey's testimony was obtained independently of the defendant's alleged confession, and thus the confession in no way "tainted" Storey's evidence. Storey's eyewitness account constituted overwhelming evidence of the defendant's guilt such that any error concerning the admissibility of *635 the confession was harmless. We note that the defendant later radically changed his story, making the credibility of any of his statements suspect.
The error assigned is found to be harmless.

ASSIGNMENT OF ERROR NO. 2: The admission of the inculpatory statement made to the O.I.D.P. investigator while awaiting trial.
The defendant argues the statement elicited by Patterson was covertly obtained without the knowledge or consent of the defendant's lawyer and "was obtained under false pretenses which violates Louisiana's standards for voluntariness, and in blatant disregard of the Rules of Professional Conduct." A hearing was held on 22 October 1997, on the defendant's motion to suppress the statement Patterson obtained. At the hearing, Patterson testified that he was a criminal investigator for the O.I.D.P., that he met with his superiors and the trial judge, that he was informed that O.I.D.P. could not represent both defendants, that the judge said he had not appointed counsel to represent the defendant, and that he then went to interview Williams, and then interviewed Gilliam. He told the defendant in the Orleans Parish Prison second floor attorney booth, "that we [O.I.D.P.] could not represent both brothers [and] that the judge would be appointing a law firm or an attorney to represent him. We did not represent him, and he understood that." Patterson testified that Gilliam was curious why the O.I.D.P. could not represent both defendants. Patterson said he did not read the defendant his rights, did not say anything to intimidate him, and made no promises or inducements.
On cross-examination, Patterson said that at the time the statement was taken, "I couldn't tell you who was representing anybody." He could not remember the length of time between the meeting with the trial judge and the taking of the statement on 25 July 1994. Defense counsel then presented Patterson with a letter from the trial judge written 11 July 1994, informing counsel that he had been appointed, and informing him of a "hearing to determine counsel" set for 20 July 1994. Later Patterson said that he knew O.I.D.P. was representing Williams from the time he was given the file, before he took the statement from the defendant. He told Gilliam that he was representing Williams and not Gilliam. He explained to him that there was a conflict of interest between Gilliam and his brother. He did not tell him that the statement "could not hurt him," and in fact did not discuss any consequences of his giving a statement. Gilliam did ask whether anyone else other than Clyde Merritt, counsel for Williams, would get a copy, and Patterson told him "[I]t was going straight into the file to Mr. Clyde Merritt."
During a motion to suppress the statement on 15 October 1997, Clyde Merritt, the appointed lawyer for Weldon Williams, testified that Patterson was his investigator with the O.I.D.P. He stated that he did not know that Patterson would be at the prison taking a statement. He further testified that Patterson was a friend of Weldon Williams' wife, knew Gilliam and his parents, and that Patterson spoke to Gilliam as "a friend of the family" in an attempt to help Weldon Williams' wife. Moreover, he testified that he had no idea how the statement was recorded, typed or signed. Nevertheless, he testified that he was aware of the statement on the day it was acquired, on 25 July 1994. He also admitted that he never contacted Gilliam's court-appointed attorney, and that the statement was taken on 25 July 1994, two weeks after Walker's appointment. Merritt testified that he would not have asked the investigator to take the statement in any event. Later in his testimony he stated, contrary to his initial testimony, that he did not know the statement existed until long after 25 July 1994.
In fact, Merritt attempted to use the incriminating statement in Weldon Williams' trial in order to exculpate his *636 client, although Merritt at that time knew that Gilliam had been represented by counsel, with the effect that the state came into possession of the statement and ultimately introduced it in Gilliam's trial.
The trial court found the statement to have been voluntarily given and held that since no state actor had participated, due process rights did not come into play. The trial judge, however, did not rule on the ethical violations counsel for Gilliam urged as a basis for exclusion.
The United States Supreme Court held that where a state actor is not involved, the question of whether a confession is admissible is governed by state laws governing the admission of evidence. Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). LSA-R.S. 15:451 provides:
Before what purposes[sic] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.[3]
In State v. Martin, 94-252, p. 3 (La.App. 5 Cir. 10/12/94), 645 So.2d 752, 754 writ denied 94-2787 (La.3/10/95), 650 So.2d 1174, the court held:
We find this statute mandates the requirement that all confessions, regardless of whether a state actor is involved, must be proven to be voluntary.
On the trial of the motion to suppress filed under the provision of this article, the burden of proof is on the defendant to prove the ground of his motion, except that the State shall have the burden of proving the admissibility of a purported confession or statement. Id.
In State v. Hammond, 97-1677 (La.App. 4 Cir. 12/30/97), 706 So.2d 530, this Court remanded a case where the questioning was undertaken by legislative auditors, i.e., not state actors with law enforcement duties. The court held that the questioning by these interrogators did not require a warning under Miranda, however, there was the requirement that the trial judge determine whether the confessions were "voluntary" under LSA-R.S.15:451. LSA-R.S.15:451 has been held to provide an independent statutory ground, apart from the motion to suppress unconstitutionally obtained evidence provided for by LSA-C.Cr.P. art. 703, to exclude involuntary confessions made in the absence of police misconduct. State v. Green, 94-0887, p. 8 (La.5/22/95), 655 So.2d 272, 279, n. 7. LSR.S. 15:451 does not limit itself to an illegally obtained statement to a public servant, the state legislative auditor, but is equally applicable to Patterson, who was neither a law enforcement official nor a public servant, but was Merritt's civilian agent. The defendant maintains that he was not cautioned that the statement could be used against him, hence it was not knowingly furnished.
We find that Patterson did not coerce, intimidate or threaten Gilliam to give the statement but we find that Patterson did promise that the statement would be kept in Merritt's folder, creating the false impression that it would remain unpublished. Moreover, why would Patterson have taken a statement if someone was not going to use it? Additionally, Merritt became a willing actor in compromising O.I.D.P.'s former client, Gilliam. Merritt had to know that the prosecution would have the statement in hand to use against Gilliam. Merritt did not use professional judgment in allowing this scenario, because he had it in his power not to use the statement at all, not only because he knew it would then be public and available to the prosecutor, but also because he knew, at least when he attempted to introduce it, that it had been *637 obtained without notifying Gilliam's counsel for the requisite consent.
While it is clear that the ethical violations do not rise to the level of a constitutional violation, our Supreme Court has recognized that the Rules of Professional Conduct have the force and effect of substantive law, and has set aside a contract on the basis of an attorney's violation of ethical rules in obtaining the contract. Succession of Cloud, 530 So.2d 1146 (La. 1988) (a lawyer's violation of disciplinary rules by acquiring a proprietary interest in a client's cause of action, other than by means of a reasonable contingency fee contract, entitles the client to avoid the contract conveying the mineral interest).
The Constitution defines only the "minimal historic safeguards" which defendants must receive rather than the outer bounds of what may be afforded them. McNabb v. United States, 318 U.S. 332, 340, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943). In other words, the Constitution prescribes a floor below which protections may not fall, rather than a ceiling beyond which they may not rise.
Attorneys are commanded to maintain the highest standards of ethical conduct. The Rules of Professional Conduct (formerly Code of Professional Responsibility) does not only delineate an attorney's duties to the court, but defines the relationships with his clients and adverse parties. Hence, the Code offers protections beyond those contemplated by the Constitution. United States v. Hammad, 858 F.2d 834, 838 (2nd Cir.1988), cert. denied, 498 U.S. 871, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990).
It is apparent that Gilliam was trying to exculpate his brother. In fact, the statement Gilliam gave to Patterson seems to dove tail with the statement Williams gave to the Internal Affairs Division, the investigatory arm of the police department. But the fact remains, that at the time Gilliam gave the statement he was still jointly charged with his brother for capital murder, and given Patterson's relationship with the family, the prevailing thought of the juvenile may have been that he could escape the death penalty at trial because of his youth, whereas Weldon Williams, a 28 year old and a former police officer, would not be that fortunate.
The defendant suggests that Patterson or his supervisors violated the Rules of Professional Conduct, specifically Rule 4.2, which provides:
In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.
In this case, it is by no means clear that there was a violation of the rule in that there was a great deal of confusion, as evidenced by Patterson's somewhat conflicting testimony, as to who was representing the defendant at the time the statement was given. Merritt's testimony is vague and ambiguous as to how Patterson, his investigator in the Williams case, came to decide purely on his own, that he would take a statement from Gilliam to be placed into Merritt's file. In fact, as mentioned above, Merritt testified that he was aware of the statement on the day it was acquired (although he later changed his testimony), and he attempted to use it at the trial of Weldon Williams, although he knew at that time that Gilliam had been represented by counsel when the statement was taken. Merritt had to know that Gilliam's counsel had never been consulted throughout the time period of the original appointment of Gilliam's counsel on 11 July 1994 to the time he attempted to introduce the statement into evidence. It could well be argued that Gilliam's statement to the O.I.D.P. investigator was not inculpatory, because Gilliam alleged that he had acted in self defense. However, the statement combined or contrasted with the statement given at the police station on 26 April 1994, at best placed Gilliam *638 squarely on the scene as a shooter and accomplice, and at worst made him a liar. Whether the statement was inculpatory or not is not what is disturbing; rather, it is the method by which it was obtained. In fact, Rule 4.2 of the Rules of Professional Conduct was violated when it should have been clear to Merritt by perusing the court record, that the statement was taken when Gilliam was represented by counsel. Furthermore, at the time he attempted its introduction at Williams' trial, he knew or should have known that Walker's approval had never been sought.
The dual purposes behind Rule 4.2 are to prevent disclosure of attorney/client communications, and to protect a party from "liability-creating statements" elicited by a skilled interrogator. Jenkins v. Wal-Mart Stores, Inc., 956 F.Supp. 695 (W.D.La.1997). In a reported civil case, the court held that an attorney was prohibited from making any use of documents provided by an employee of the adverse corporate party. In re Shell Oil Refinery, 143 F.R.D. 105 (E.D.La.1992), amended on reconsideration in part, and order amended, 144 F.R.D. 73 (E.D.La. 1992).
We conclude that where there is an improper communication discovered or considered before it is used at trial, and a violation of the ethical rule is found, it should be held inadmissible. Jenkins, supra. Patterson, even if we believe that he went on his own, elicited the kind of liability-creating statement that Merritt kept in his file for further use for the benefit of Williams and to the detriment of Gilliam. The purpose underlying Rule 4.2 and its analogues[4] is to protect the sanctity of the attorney-client relationship and by so doing, to safeguard the integrity of the profession and preserve public confidence in our system of justice.
No court should condone what happened here. O.I.D.P. represented both Williams and Gilliam, at least until 11 July 1994. The very organization through its investigator and ultimately through its counsel, brought harm to a former client by using the statement which had been obtained by Merritt's agent without permission of the defendant's counsel. We do not wish to be considered as lending our approval to the practice, if indeed a practice exists, of interviewing accused represented persons in jail in the absence of counsel. The better, fairer and safer practice is to afford the defendant's attorney reasonable opportunity to be present. While we have found no cases on point, we hold that a case by case analytical approach is to be utilized by courts contemplating whether supervisory suppression is warranted.
However, as we have stated before, the direct, uncontroverted eyewitness evidence against Gilliam was overwhelming. The evidence showed inter alia that two different guns were used at the time of the murder. Williams' gun was clearly identified as the weapon disgorging Black Talons. Storey positively identified both Williams and Gilliam, Williams from a line up and Gilliam from longstanding acquaintance. The car was identified, not only by the surviving victim, but also by Mr. Montgomery, who described two men with flashlights looking for the victims and leaving *639 the scene where Storey was later found. Storey's testimony alone would have convicted Gilliam of second degree murder, irrespective of the introduction of the statement. The statement should have been excluded but its inclusion was harmless error. Therefore, this assignment of error lacks merit.

THIRD ASSIGNMENT OF ERROR: The prosecutor improperly described defendant's statement as a confession[5], improperly stated that defense counsel told the jury he would prove that the surviving victim shot the decedent[6] and referred to defendant's efforts to suppress his statement to the O.I.D.P. investigator.[7]
Argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state's rebuttal shall be confined to answering the argument of the defendant. La.C.Cr.P. art. 774. Based on the trial record and the statements which were introduced, albeit improperly, the arguments were entirely proper. The defendant did in fact confess to an element of the crime in that he admitted shooting "Slugger." Although defense counsel never promised to prove that the defendant acted in self-defense, the jury was presented with evidence that the defendant acted in self-defense. As to the suppression of the statement, the State was trying to point out that the defendant first said that Williams had been the primary instigator of the crimes, and then later said that Williams was not involved at all. The comment was directed to the defendant's credibility, evidence of which was before the jury.
This assignment is without merit.

FOURTH ASSIGNMENT OF ERROR: The trial court erroneously permitted expert witnesses to give speculative opinion evidence.
La. C.E. art. 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The defendant fails to explain the manner in which the opinion evidence offered by the expert pathologist, firearms examiner and police officer exceeded their respective areas of competence or involved improper speculation.
The defendant contends that Newman, the pathologist, was allowed improperly to testify as to whether the victim could have been running when shot. There is no specification of why a pathologist is unqualified to give this sort of testimony. Clearly a pathologist is qualified to testify as to whether a victim may have been running when he suffered the wounds that were the subject of the pathologist's autopsy.
Defendant contends that Treadaway, the firearms examiner, and Curdrado, a police officer, were allowed improperly to testify that the gun might have jammed. However, he fails to point out any reason why such a statement lies beyond the competence of these experts. A firearms examiner and a police officer are qualified as experts to testify as to whether certain semi-automatic weapons frequently jammed.
This assignment is without merit.

*640 FIFTH ASSIGNMENT OF ERROR: The trial court erroneously overruled defense motions to discover evidence in IAD files concerning defendant's brother and co-defendant, NOPD Officer Weldon Williams.
Prior to trial, the defendant filed a "Motion For Disclosure Of Evidence That Codefendant Williams Was Involved In The Illicit Trafficking Of Cocaine While A Police Officer, And For Disclosure Of Information In IAD Files Which Would Impeach Willard Storey." The defendant argues that the trial court erred in denying the motion because he would have been able to prove that Storey stole cocaine in the residence burglary, giving Williams a motive to kill him.
La. C.E. art. 401 defines relevant evidence as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Here, there was absolutely no evidence presented that cocaine was involved in the residence burglary. Any tie between the burglary and the cocaine trade was purely speculative. Therefore, information concerning Williams' participation in the cocaine trade does not appear relevant and was therefore not admissible. La. C.E. art. 402.
This assignment is without merit.

SIXTH ASSIGNMENT OF ERROR: The verdict was contrary to the law and the evidence.
The defendant argues the evidence was insufficient to support the conviction, suggesting that the proper verdict would have been manslaughter in that the killing was committed in hot blood over a residence burglary.
Gilliam was charged with and convicted of second degree murder, which is defined in pertinent part as: "The killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm." R.S. 14:30.1. R.S. 14:31 defines manslaughter in part as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.
In this case, Storey testified that the defendant appeared at his house, lured him and Caesar to the car where Williams was waving a gun, drove with the men to an abandoned field, said "Let's do this" to Williams, and then began firing a gun. The defendant argues that the forensic evidence supports a finding that all the bullets that killed Caesar were fired from Williams' gun. However, the law of principals establishes that all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24.
Here, the defendant fired at Storey, evidencing his intent to kill him or inflict serious bodily harm. Furthermore, even had the defendant not actually fired the bullets that killed Storey, he clearly aided and abetted Williams who had the specific intent to kill or inflict great bodily harm.
In addition, the defendant has the burden of proving heat of blood or sudden passion by a preponderance of the evidence. State v. Camp, 571 So.2d 195, 200 (La.App. 4 Cir.1990). Here, the defendant *641 did not offer evidence tending to establish "heat of blood."
This assignment is without merit.

CONCLUSION AND DECREE
Defendant's conviction of second degree murder and his sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
MURRAY, J., concurs with reasons.
MURRAY, J., concurring:
Although I agree with the majority's affirmance of Mr. Gilliam's conviction, I must respectfully disagree with the conclusion, in assignment of error # 1, that his statement to the police should have been suppressed. Unlike the "brush-off" given to the defendant's inquiry in State v. Coston, 98-0470 (La.App. 4th Cir.9/16/98), 720 So.2d 714, writ denied, 98-2803 (La.11/24/98), 729 So.2d 565, in this case both Mr. Gilliam and his mother were informed that because an attorney was not available, "We can stop the statement right now. Nothing will change." This explanation, which followed a private discussion between the minor defendant and his mother, supports the trial court's apparent conclusion that Mr. Gilliam "reopened the dialogue with the authorities" and then made a knowing, intelligent and voluntary waiver of his right to remain silent, as required by Oregon v. Bradshaw, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983) (citation omitted). On such a close question, the trial court's determination is entitled to great deference when, as here, it is supported by the evidence. State v. Brooks, 505 So.2d 714, 724 (La.1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987); State v. Bordes, 98-0086, p. 9 (La.App. 4th Cir. 6/16/99), 738 So.2d 143, 148. Therefore, I do not find any error in the admission of this statement into evidence at trial.
NOTES
[1] At Williams' trial, Merritt attempted to use a statement made by Gilliam to an O.I.D.P. investigator, wherein Gilliam incriminated only himself. The statement was taken while Gilliam was awaiting trial and after Walker had been appointed by the court to represent him.
[2] The tape has not been made a part of the record.
[3] The word "purposes" in this statute should be `purports'. The Supreme Court, in quoting the section, has, at least twice inserted `[purports]' following "purposes." See State v. Joseph, 217 La. 175, 46 So.2d 118 (1950); State v. Lanthier, 201 La. 844, 10 So.2d 638, fn. 1 (1942)
[4] LSA-C.C.P. art. 371 provides: An attorney at law is an officer of the court. He shall conduct himself at all times with decorum, and in a manner consistent with the dignity and authority of the court and the role which he himself should play in the administration of justice.

He shall treat the court, its officers, jurors, witnesses, opposing party, and opposing counsel with due respect; shall not interrupt opposing counsel, or otherwise interfere with or impede the orderly dispatch of judicial business by the court; shall not knowingly encourage or produce false evidence; and shall not knowingly make any misrepresentation, or otherwise impose upon or deceive the court.
For a violation of any of the provisions of this article, the attorney at law subjects himself to punishment for contempt of court, and such further disciplinary action as is otherwise provided by law.
[5] "George has confessed to this crime."
[6] "[Defense counsel] was going to prove that Willard shot Mitchell with Weldon's gun."
[7] "When we got this statement they were hollering like pigs. They didn't want us to have that for nothing."