720 So.2d 714 (1998)
STATE of Louisiana
v.
Ricky COSTON.
No. 98-K-0470.
Court of Appeal of Louisiana, Fourth Circuit.
September 16, 1998.
Rehearing Denied October 23, 1998.
*715 Timothy R. Saviello, New Orleans, for Defendant-Relator Ricky Coston.
Harry F. Connick, District Attorney, Glen Woods, Assistant District Attorney of Orleans Parish, Elizabeth Parker, Law Clerk, New Orleans, for Respondent the State of Louisiana.
Before LOBRANO, MURRAY and CIACCIO, JJ.
MURRAY, Judge.
Defendant-relator, Ricky Coston, has been indicted for first degree murder in connection with the January 1997 death of Lillian Thomas. He pled not guilty and filed a motion to suppress a statement made to police shortly after his arrest. The trial court denied the motion, and Mr. Coston applied for supervisory writs to review that ruling. This court initially denied his application, finding he had an adequate remedy on appeal. State v. Coston, 98-0470 (La.App. 4th Cir.5/14/98) (unpublished). The Supreme Court subsequently granted Mr. Coston's application for relief from that court, and remanded the matter for briefing, argument and opinion. State v. Coston, 98-1540 (La.6/24/98), 719 So.2d 483. For the reasons that follow, we find that the State failed to prove, beyond a reasonable doubt, that Mr. Coston knowingly waived his right to an attorney's presence during questioning. Accordingly, the trial court's ruling is reversed and the motion to suppress is granted.
In the early morning hours of January 28, 1997, Robin Bunley[1] led officers of the New Orleans Police Department to the charred body of her landlady, Ms. Thomas, and implicated Ricky Coston in connection with the death. Mr. Coston was arrested later that day and taken to police headquarters, where Detectives Kenneth Harris and Dwight Deal began to question him at approximately 6:15 p.m. The interview concluded when, shortly *716 after audiotaping began at 9:20, Mr. Coston refused to speak further without an attorney.
In November 1997, the State gave notice of its intent to offer Mr. Coston's confession into evidence. A summary of the oral statement was attached to the pleading, as follows:
On Tuesday, 1/28/97, approximately 7:00 p.m., while in the Detective Bureau, Detectives Kenneth Harris and Dwight Deal interviewed Ricky Coston relative to his knowledge of the murder of Mrs. Lillie Thomas. Mr. Coston was again advised of his constitutional rights to which he stated he understood. Mr. Coston then waived his constitutional rights and agreed to speak with the detectives. He stated he hadn't done anything wrong.
Mr. Coston admitted to Detectives Deal and Harris that he had seen Mrs. Thomas' body lying on the floor in the rear room of Ms. Bunley's house. He continued that Ms. Bunley told him that Mrs. Thomas had died of a heart attack. He admitted to smelling the stench of dead flesh, but did not know how long Mrs. Thomas' body had been in Ms. Bunley's residence, 4737 Loyola Street. Mr. Coston further stated that Ms. Bunley had shown him checks stolen from Mrs. Thomas, and tried to solicit his help in cashing them. Mr. Coston admitted to sleeping at Ms. Bunley's residence in the past, but stated he never had any of Ms. Bunley's blankets in his car. Mr. Coston never admitted to killing Mrs. Thomas or burning her body. He did say, however, that Ms. Bunley had asked him to burn the body for her. Ms. Bunley also told him where the body was behind the Clinic on South Claiborne Avenue.
Mr. Coston responded with a motion to suppress this evidence, asserting that he gave the statement only after the police had refused his request for an attorney.
At the hearing on the motion to suppress, Detective Harris testified that when he entered the interview room he verbally advised Mr. Coston of his Miranda rights, informed him of the nature of the investigation, and asked the defendant if he would answer some questions. Mr. Coston told the detectives that he had visited Ms. Bunley about a week earlier. Ms. Bunley showed him a dead body, believed to be that of a woman, from which a foul odor was emanating, and asked him to get rid of it, possibly by burning. She also showed him a checkbook with the surname Thomas on it. Mr. Coston denied any further knowledge or involvement in the matter, stating that he refused Ms. Bunley's requests for help and left the house.
Detective Harris stated that he again informed Mr. Coston of his rights and asked if a formal statement could be audiotaped. Because the defendant agreed, the detective began completing a "RIGHTS OF AN ARRESTEE OR SUSPECT" form with the date, time, crime charged and Mr. Coston's identifying information. Detective Harris testified that after the tape recorder was turned on and he began reading the Miranda rights, Mr. Coston "decided that he wished to exercise those rights and not give a statement relative to the incident."
Detective Harris had not reviewed the audiotape prior to the suppression hearing. He testified that he made no notes of his interview with the defendant, and no written statement was taken. However, he was positive that Mr. Coston had not asked for an attorney, or a phone book to find one, before the audiotaping began. He denied telling the defendant, at any point in the interview, that it was too late to get an attorney, or that Mr. Coston had asked why his earlier requests for an attorney were ignored or refused. Detective Harris reiterated that Mr. Coston had been advised of his rights three times, and that all questioning was stopped when Mr. Coston stated he wanted an attorney.
Although Detective Deal was present during Mr. Coston's interview and testified regarding other motions before the court, he was not questioned about the circumstances of the interview with Mr. Coston.
The audiotape made at 9:20 p.m. on January 28, 1997 was admitted into evidence for the court's consideration. On the tape, Detective Harris first reads the preliminary information from the "RIGHTS OF AN ARRESTEE OR SUSPECT" form, confirming the accuracy of Mr. Coston's identifying information. The *717 detective then begins to read the numbered Miranda rights, asking Mr. Coston after each one whether he understands. The following exchange is heard:
Q: You havethe third is, you have the right to consult with and obtain the advice of an attorney before answering any questions. Do you understand that right, sir?
A: Yes.
Q: Number four is, if you cannot afford an attorney, the courts will obtain an attorney to represent and advise you. Do you understand that right, sir?
A: Yes.
Q: The fifth is, you have the right to have an attorney, or an appointed attorney present at the time of any questioning or giving of any statements. Do you understand that right, sir?
A: Yes,.. so why.. why when I asked for an attorney to be here to give this statement, why I can't get no attorney, an appointed attorney?
Q: It is 9:20 p.m., the courts are not open at this time. I believe that you were asked that if you have an attorney, that you want to contact.
A: I wasn't asked that.
Q: Okay, do you have an attorney?
A: I do not have an attorney.
Q: Do you have an attorney which you wish to contact, in order to represent you in this matter?
A: I'ma [sic] have to look in the phone book, right now.
Q: Is there an attorney that you could call that will come in to represent you during this matter?
A: I don't know, off by hand [sic] right nowbut I could call someone to get me an attorney.
Q: Is it your wish that you have an attorney before you give a statement relative to this matter?
A: Yes.
Detective Harris concluded the proceedings at 9:42 p.m. and turned off the recorder. The RIGHTS form, also entered into evidence at the suppression hearing, indicates that Mr. Coston understood his rights, but the line for his signature contains the notation "refused." Underneath, a box is checked off indicating he "was undecided, consequently was advised not to sign."
On January 23, 1998, the trial court denied Mr. Coston's motion to suppress the statement made to the two detectives, explaining as follows:
I have reviewed the microcassette tape that Detective Harris submitted in this case and I have also considered Detective Harris' live testimony that he gave in connection with the motion to suppress and I have tested his voracity [sic] both while he was on cross examination and direct examination and I have considered the totality of his testimony and the circumstances of the case and I find that based on the presentation of his testimony live in court and his manner and demeanor on the stand, that Detective Harris was telling the truth when he talked about Mirandizing this particular defendant and I note your objection for the record.
In seeking reversal of this ruling, Mr. Coston argues that the audiotape clearly shows that he had invoked his right to counsel prior to making his statement, contradicting Detective Harris' testimony. He emphasizes that the detective denied telling him he could not get an attorney because the courts were closed, as heard on the tape, indicating that the officer's recollection was unreliable. Mr. Coston also claims that Detective Harris testified erroneously that all questioning had ceased when the defendant invoked his right to an attorney; he asserts that the tape demonstrates, instead, that the officer persisted in his queries in an attempt to get a statement on tape. The defendant thus contends that while the evidence may support a finding that he had been advised of his rights, Detective Harris' inconsistent testimony is insufficient proof that Mr. Coston had knowingly waived his right to counsel.
The State contends, however, that Detective Harris explicitly testified that Mr. Coston had been informed of his rights and, with full understanding of those rights, made no request for an attorney until after he had given a statement. Once he realized the "devastating effect" of his confession, the *718 State argues, Mr. Coston decided to pretend that he had asked for an attorney earlier, a plan formulated from his extensive knowledge of the criminal justice system.[2] The State asserts that Detective Harris' full compliance with the law is clearly demonstrated on the audiotape: as soon as it was determined that Mr. Coston was invoking his right to counsel, the officer ceased questioning the defendant about the murder. The State thus argues that Mr. Coston's statement is admissible at trial because the evidence proves he knowingly waived his rights prior to questioning.
Before a statement made during custodial interrogation may be admitted into evidence against a defendant, the State must prove beyond a reasonable doubt that he was first advised of his constitutional rights and that he knowingly waived those rights. State v. Tart, 93-0772, p. 22 (La.2/9/96), 672 So.2d 116, 126; State v. Davis, 92-1623, p. 19 (La.5/23/94), 637 So.2d 1012, 1024, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). The validity of a waiver of rights is determined on a case-by-case basis under the totality of the circumstances. State v. Koon, 96-1208, p. 7 (La.5/20/97), 704 So.2d 756, 762. The law is clear, however, that once an accused has asked for the assistance of counsel, the mere fact that he responded to further questioning does not establish a knowing waiver. Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378 (1981). The trial court's determination of a statement's admissibility is entitled to deference, and it should not be disturbed unless unsupported by the evidence. Davis, supra, 92-1623 at p. 20, 637 So.2d at 1024.
The crucial question in the instant case is whether Mr. Coston asked for an attorney before or during the questioning. This issue was considered by our Supreme Court in State v. Abadie, 612 So.2d 1, 5 (La.), cert. denied, 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993):
[I]f "the individual indicates in any manner at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease" and ... if he "states that he wants an attorney, the interrogation must cease until an attorney is present." The request need not be formal or direct, or for a particular attorney, but is sufficiently conveyed by even an unsuccessful attempt to reach a lawyer, or an inquiry whether the police could recommend a lawyer. Indeed, courts must give a broad rather than a narrow interpretation to a suspect's request for counsel.
612 So.2d at 5 [emphasis added; citations omitted]. Similarly, in State v. Carter, 94-2859, p. 23 (La.11/27/95), 664 So.2d 367, 384 [citation omitted], federal jurisprudence was quoted as establishing that "the magic words, `I want a lawyer,'" need not be spoken to invoke the right to counsel. More recently, this standard was clarified as merely requiring "an unambiguous, clear assertion of the right," rather than an equivocal statement that "maybe I should talk to a lawyer," in order to put an end to further interrogation. State v. Robertson, 97-0177, p. 27 (La.3/4/98), 712 So.2d 8, 31 [discussing Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)].
In the instant case, the trial court expressly credited Detective Harris' testimony "about Mirandizing this particular defendant," a determination that is entitled to great deference. In fact, however, the detective's testimony on this issue consisted only of the bare assertions that (1) Mr. Coston was advised of his rights three times, (2) that he waived his rights, and (3) that he did not ask for an attorney until after taping had begun. Relying solely on his memory rather than any notes of the interview, Detective Harris even denied mentioning the late hour in connection with the appointment of an attorney for Mr. Coston.
In contrast to the straightforward proceedings described by Detective Harris, the recorded *719 portion of his interview with Mr. Coston strongly suggests that the defendant had previously asked about having a lawyer present during questioning. Notably, the detective's immediate response to this audiotaped inquiry was to explain that an attorney could not be appointed because the courts were closed, followed by additional questions concerning the identity of a specific attorney "that will come in to represent you." Even if unintentional, this colloquy creates the impression that unless Mr. Coston knew of an attorney available at that hour, he was not entitled to have one present for the interview. If Detective Harris made similar equivocal responses to the defendant before the tape was turned on, as the recording suggests, it is certainly arguable that Mr. Coston could not have made a knowing waiver of his Miranda rights.
It is also noted that Detective Harris' testimony was uncorroborated by Detective Deal, despite the latter's apparent presence throughout the interview with Mr. Coston. Lack of corroboration was found to weigh against a finding of a knowing waiver of rights in State ex rel. White v. State, 606 So.2d 787 (La.1992). In that case, as here, the interviewing detective took no notes of the defendant's oral statement and did not record the statement. Additionally, the police officer admitted testifying to a signed waiver of rights form that did not exist. In finding that the defendant's oral statement should have been suppressed, the court stated:
The burden was on the state to prove that White knowingly and intelligently waived his Miranda rights before making the statement placing him at the scene of the crime. The only evidence of a waiver is Detective Bailey's inconsistent testimony. That testimony alone, not corroborated by Detective Hoyt and self-contradictory, was insufficient to carry the state's heavy burden of proving a waiver.
White, 606 So.2d at 789. Although in this case there was no gross contradiction in Detective Harris' testimony, the audiotape suggests that the ten months elapsed between the interview with Mr. Coston and the suppression hearing had weakened the officer's recall pertaining to the substance and sequence of his discussion with the defendant. Thus, the State's failure to present the testimony of Detective Deal, who may have been able to provide additional details of the interview, must be considered in our review of the trial court's ruling.
Based upon the above evidence, we cannot find that the State established, beyond a reasonable doubt, that Mr. Coston made a knowing waiver of his right to counsel before making the oral statement at issue. While the trial court's express reliance on Detective Harris' credibility must be accorded great deference, the officer's inability to recall much more than that "Mr. Coston waived his rights" undercuts the weight of his testimony. The audiotaped portion of the interview not only suggests that the defendant had raised the issue regarding an attorney's presence earlier in the evening, but that the detective's responses resulted in Mr. Coston's inaccurate understanding of his rights. Because neither Detective Harris nor Detective Deal testified with any detail about the discussions preceding the oral statement at issue, it is impossible to determine whether Mr. Coston had made "an unambiguous, clear assertion of the right" to counsel or if, knowing that he could refuse to discuss the matter until an attorney had been appointed to assist him, he nevertheless decided to answer the questions posed to him. Because the State has failed to carry its heavy burden of proving a knowing and intelligent waiver, Mr. Coston's statement cannot be used against him at trial. The judgment of the trial court is reversed and the motion to suppress is granted. The matter is remanded for further proceedings.
JUDGMENT REVERSED; MOTION GRANTED; REMANDED FOR FURTHER PROCEEDINGS.
NOTES
[1] Although named in the same indictment with Mr. Coston, Ms. Bunley has been tried separately and found guilty of second degree murder.
[2] Apparently, in support of this argument, Mr. Coston's rap sheet was submitted by the State in opposition to his writ application. It shows a 1986 conviction for possession of stolen property, a 1983 conviction for theft, a 1982 misdemeanor conviction for shoplifting, and a 1979 conviction for armed robbery. Between April 1980 and September 1996 he had four additional felony arrests.