894 So.2d 415 (2005)
STATE of Louisiana
v.
Charles BUTLER.
No. 2004-KA-0880.
Court of Appeal of Louisiana, Fourth Circuit.
January 12, 2005.
*416 Eddie J. Jordan, Jr., District Attorney, Kevin G. Boitmann, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Sherry Watters, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
*417 (Court composed of Judge CHARLES R. JONES, Judge JAMES F. McKAY III, and Judge ROLAND L. BELSOME).
CHARLES R. JONES, Judge.
Charles Butler appeals his conviction for the attempted manslaughter of Thelma Batiste, and his sentence as a fourth offender to imprisonment for the rest of his natural life. We affirm.
Butler was charged by bill of information with attempted second-degree murder. He was tried by a twelve-person jury and found guilty of attempted manslaughter. He was sentenced to twenty years at hard labor. The district court adjudicated Butler a fourth-felony habitual offender, vacated the previous sentence, and re-sentenced him to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence. The district court granted his motion for appeal on that same date. After complying with the briefing schedule, Butler requested an opportunity to file a pro se brief. He was granted time within which to file this brief, and he has filed same.
Butler was convicted of attempted manslaughter for dowsing his ex-girlfriend Ms. Batiste with gasoline and igniting her. The incident occurred in the early morning hours of March 11, 2002, at the victim's home. The victim and Butler had dated for two years, and resided together for two more years in the victim's home. The victim asked Butler to move out some six months before the incident, after he stopped helping her pay the bills. Butler initially refused to leave, but eventually moved out three months before the incident.
Shortly after midnight on March 11, 2002, Ms. Batiste was at home with a male friend, when Butler telephoned her, asking whose car was in her driveway. He began cursing her and demanding that she step outside. She looked through her peephole and saw Butler's van outside. As soon as she moved her face away from the peephole, Butler kicked in her door. He walked toward her bedroom, but then turned and walked out the front door, stating that he was going to get her. She heard the sound of a can scraping on her front porch, and then Butler doused her with gasoline three or four times and ignited her with a fireplace/barbecue lighter he pulled from his pocket. Ms. Batiste ran to her bedroom, where her male friend helped suppress the fire on her. She telephoned 911, her five sisters, and Butler's sister and mother. She remembered the ambulance and police arriving, but the next thing she remembered after that was waking up in the burn center in Shreveport, Louisiana. She was burned over seventy percent of her body, from mid-thigh to her forehead.
It was stipulated that if Dr. Charles Kelly, one of the emergency room physicians at Charity Hospital who initially treated the victim, were called as a witness he would testify that the victim had burns to seventy percent of her body.
Butler testified at trial that after Ms. Batiste let him inside her home that night, he went into the bedroom and saw a man in bed. Butler testified that he started to walk out of the home. On the way out, he picked up a bottle of gas that was inside, intending to do some damage to Ms. Batiste's home. He testified that as he opened the top of the bottle, the gas went "whoosh." He also testified that at the same time, Ms. Batiste bumped him and gas spewed on him and Ms. Batiste. He further testified that he grabbed the lighter off of a table, and lit it. When the room ignited, he dropped the lighter. He denied taking the gas and the lighter to Ms. Batiste's home, and that he did not intend to hurt or kill her.
*418 Butler gave a taped statement at 4:38 a.m., on March 11, 2002, the morning of the incident, to New Orleans Police Detectives Fred Bates Jr. and Darryl Ribet. In the statement, Butler stated that on the night in question he telephoned Ms. Batiste to let her know that he was coming over to get some clothes out of the trunk of his car, which in fact, Ms. Batiste testified was parked in her driveway. Butler stated that he came over and asked to be let inside, and was let in. After Ms. Batiste informed him that she had company, Butler stated that he walked to the bedroom, where he saw her male friend in the bed. Butler said he turned around and walked towards the front door, and stated that he observed a can of gasoline inside, near the front door. He stated that he grabbed it and dowsed Ms. Batiste with gas, picked up the lighter and flicked it, igniting gasoline vapors and Ms. Batiste.
Charles Sherman, Ms. Batiste's friend, who was present in her home that night, testified at trial that he had fallen asleep in the bedroom. He testified that he was awakened when Ms. Batiste came running into the room in flames. He helped put out the flames on her and the fire in the dining room area of the residence. He testified that his car was parked in the driveway that night.
A review of the record reveals one patent error. Butler was incorrectly denied the benefit of parole. See La. R.S. 15:529.1(A)(1)(c)(i) and (G); La. R.S. 14:27(D)(3) and R.S. 14:31(B). However, this issue is rendered moot by the disposition as to his second assignment of error.
Butler first argues that the district court erred in denying his motion to suppress his statement. His argument is directed to both his taped statement and what he claims was a statement he gave to a fire department investigator.
Before the State may introduce an inculpatory statement or confession into evidence, it must affirmatively show that the statement was free and voluntary and not the result of fear, duress, intimidation, menace, threats, inducements, or promises. La. R.S. 15:451; State v. Gradley, 97-0641, p. 9 (La.5/19/98), 745 So.2d 1160, 1166; see also State in Interest of J.M., 99-1271, p. 2 (La.App. 4 Cir. 6/30/99), 743 So.2d 228, 229. The State must prove that the accused was advised of his Miranda[1] rights and voluntarily waived these rights in order to establish the admissibility of a statement made during custodial interrogation. State v. Green, 94-0887, pp. 9-10 (La.5/22/95), 655 So.2d 272, 280; State v. Labostrie, 96-2003, p. 5 (La.App. 4 Cir. 11/19/97), 702 So.2d 1194, 1197. A court must look to the totality of the circumstances surrounding the making of the statement to determine its voluntariness. State v. Lavalais, 95-0320, p. 6 (La.11/25/96), 685 So.2d 1048, 1053. The testimony of police officers alone can be sufficient to prove that Butler's statements were freely and voluntarily given. State v. Jones, 97-2217, p. 11 (La.App. 4 Cir. 2/24/99), 731 So.2d 389, 396.
As to whether a Butler has invoked his right to an attorney, the Louisiana Supreme Court stated in State v. Payne, XXXX-XXXX (La.12/4/02), 833 So.2d 927:
The purpose of the Miranda-Edwards v. Arizona, [451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)] guarantee of right to counsel is to protect the interest of the suspect's desire to deal with the police only through counsel. State v. Kelly, 95-1663, p. 6 (La.App. 3 Cir. 5/8/96), 677 So.2d 495, 499 (citing McNeil v. Wisconsin, 501 U.S. 171, 178, *419 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991)). It is the inherent coercive effect of custody and interrogation on an accused that is the essential predicate to the prescription contained in the Miranda-Edwards line of cases, that counsel be present if requested, when an interrogation occurs in a custodial setting.
* * *
The Miranda right to counsel is a prophylactic rule that does not operate independent from the danger it seeks to protect against, i.e., the compelling atmosphere inherent in the process of in-custody interrogation, and the effect that danger can have on a suspect's privilege to avoid compelled self-incrimination. See Miranda, 384 U.S. at 478, 86 S.Ct. at 1630. . . . The Supreme Court stated the invocation of that guarantee ". . . requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." McNeil, 501 U.S. at 178, 111 S.Ct. at 2209 (emphasis in original).
* * *
The applicability of the "`rigid' prophylactic rule" of Edwards requires courts to "determine whether the accused actually invoked his right to counsel." Davis v. United States, 512 U.S. [452] at 458, 114 S.Ct. [2350] at 2355 [129 L.Ed.2d 362 (1994)] (emphasis in original) (citations omitted). To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. Davis, 512 U.S. at 458-459, 114 S.Ct. at 2355. Invocation of the Miranda right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." Davis, 512 U.S. at 459, 114 S.Ct. at 2355 (citation omitted). If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable police officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, the cessation of questioning is not required. Id. (emphasis in original). The suspect must articulate his desire to have counsel present with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. Id. In analyzing the prophylactic rules of Miranda and Edwards, we are mindful that the "value of any prophylactic rule ... must be assessed not only on the basis of what is gained, but also on the basis of what is lost." Minnick, 498 U.S. at 161, 111 S.Ct. at 495 (Scalia, J., dissenting). "Admissions of guilt are more than merely desirable; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law." Moran v. Burbine, 475 U.S. 412, 426, 106 S.Ct. 1135, 1143, 89 L.Ed.2d 410 (1986).
Recently, the United States Fifth Circuit Court of Appeals, sitting en banc, addressed this troubling issue in Soffar v. Cockrell, 300 F.3d 588, 595 (5th Cir.2002), and held the suspect's procedural questions while he was in custodial interrogation did not rise to the level of unambiguous invocation of his right to counsel. In that case, Max Soffar, a Texas state prisoner, applied for a writ of federal habeas corpus. A panel of the Fifth Circuit granted him habeas relief on the issue of his Fifth Amendment rights. The panel opinion, applying a totality of the circumstances analysis and remaining mindful of Michigan v. Jackson, [475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 489 [631] (1990 [1986])] *420 wherein the Supreme Court stated that the courts must give a "broad, rather than a narrow, interpretation to a request for counsel," concluded that Soffar had unambiguously requested counsel during custodial interrogation. Soffar v. Cockrell, 300 F.3d at 595, n. 6; Soffar v. Johnson, 237 F.3d 411, 455 (5th Cir.2000), overruled by Soffar v. Cockrell, 300 F.3d 588 (5th Cir.2002). In overruling the panel decision, the Fifth Circuit examined the suspect's statements with regard to the "bright-line" rule of Davis, under which "a statement either is such an assertion of the right to counsel or it is not." Soffar v. Cockrell, 300 F.3d at 595 (quoting Davis, 512 U.S. at 459, 114 S.Ct. at 2355). The en banc court categorized Soffar's statements made during custodial interrogation as: he asked whether he should get an attorney; how he could get one; and how long it would take to have an attorney appointed. Soffar v. Cockrell, 300 F.3d at 595. The Fifth Circuit, examining its own precedent and decisions of other circuits, found each of these questions has been rejected as procedural and too equivocal to constitute a clear invocation of counsel. Id. (footnote omitted).

* * *
In Davis, the Supreme Court declared that the suspect must "unambiguously request" counsel "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney" in order to cease custodial interrogation. Davis, 512 U.S. at 459, 114 S.Ct. at 2355. The United States Supreme Court specifically declined to extend Edwards and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney. Id. In declining to extend Edwards the Court stated:
The rationale underlying Edwards is that the police must respect a suspect's wishes regarding his right to have an attorney present during custodial interrogation. But when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning "would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity," Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975), because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present. Nothing in Edwards requires the provision of counsel to a suspect who consents to answer questions without the assistance of a lawyer.... We also noted [in Miranda, 384 U.S. at 485, 86 S.Ct. at 1633] that if a suspect is "indecisive in his request for counsel," the officers need not always cease questioning. Davis, 512 U.S. at 460, 114 S.Ct. at 2355-2356.
The Court held that after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney. Id., 512 U.S. at 461, 114 S.Ct. at 2356. Davis established a bright-line rule, under which "a statement either is such an assertion of the right to counsel or it is not." Soffar v. Cockrell, 300 F.3d at 595 (citing Davis, 512 U.S. at 459, 114 S.Ct. at 2355).
Payne, XXXX-XXXX, pp. 7-14, 833 So.2d at 934-937.
*421 In the instant case, Butler argues that he clearly said and indicated that he wanted an attorney. He argues that he said this to Ms. Batiste's sister, when she was convincing him to turn himself into police. However, neither the transcript of the trial testimony nor the motion to suppress hearing reflect that Butler ever clearly said he wanted an attorney, to Ms. Batiste's sister or to anyone else. Ms. Batiste's sister, Gaynell Cola, testified in chambers at trial and subsequently in the presence of the jury that she spoke to Butler later on the morning of the incident, and urged him to turn himself into police. She testified that she was afraid he would hurt himself. She also testified, in chambers only, that she gave Butler an attorney's name and telephone number, and told Butler that he needed to get in touch with someone.
Butler's taped statement reflects that prior to the giving of that statement he had already been advised of his Miranda rights and signed the rights-of-arrestee form, waiving his rights. New Orleans Police Department Detective Fred Bates Jr. testified at the hearing on the motion to suppress that Butler, of his own free will, without any force, intimidation or coercion, signed the form stating that he wanted to waive his rights and give a statement. Detective Bates testified at trial that Butler signed the rights-of-arrestee form, stating that he was willing to talk with police and waiving his right to counsel. A copy of that rights-of-arrestee form was introduced into evidence at trial, and it contains Butler's signature, affirming that he understood his rights but was waiving them. The subsequent taped statement reflects that Detective Bates advised Butler of his rights again before Butler gave his taped statement. Butler said in the statement that his highest level of education was the twelfth grade, that he could read and write the English language, and that he was then employed full-time as a "roller operator." A point of contention is the following colloquy:
Q. O.K. and finally, you have a right to have your attorney and or appointed attorney present at the time of any questioning or the giving of any statement including this one. Do you understand this?
A. Yeah, that's what I'm uh, that's what I'm confused about. So, I can give a statement and still obtain an attorney?
Q. That's correct. You can obtain an attorney now, before you give a statement or during the time that you are giving a statement or after you give a statement. At anytime you please.
A. O.K.
Q. At this point and time would [sic] like to obtain an attorney?
A. Inaudible.
Q. O.K., but you still have the right, now, uh, in order to... in other words, we have to have you say that you don't want an attorney to give the statement.
A. Uh, yeah, uh, let's go with the statement.
While the transcript of the taped statement reflects that Butler's response to the question as to whether he wanted to obtain an attorney was inaudible, the actual tape recording evidences that he said something inaudible, followed by the clear statement: "I can't get him now anyway." By this statement Butler obviously meant that a particular attorney he had in mind would not be available to him at that point in time  4:38 a.m. When Detective Bates next informed him that if he wished to give a statement he had to say that he did not want an attorney, it was clear that Detective Bates meant that if Butler wished to *422 give the statement that he already had stated that he wanted to give, without an attorney present, Butler had to say that he did not want an attorney. Butler had already been advised of his rights in writing, and he had signed the rights-of-arrestee form waiving those rights and stating that he wished to give a statement to police without an attorney present. Detective Bates had also verbally informed Butler again of his rights, including his right to have "your attorney and or [sic] appointed attorney present at the time of any questioning or the giving of any statement including this one."
Butler expressed some confusion as to whether, if he gave a statement without an attorney present to represent him, he would thereafter still be able to obtain an attorney. He was clearly concerned that if he waived his right to have an attorney present before or when he gave a statement, he would thereafter be barred from obtaining one. Detective Bates assured Butler that he could obtain an attorney at that point in time, before he gave the statement, while he was giving the statement, or after he gave the statement  "[a]t anytime you please."
Considering the totality of the circumstances, Butler knowingly and intelligently waived his right to consult with an attorney before he made his statement or to have an attorney present while he gave his statement. Considering the totality of the circumstances, he was not misinformed of his right to counsel by virtue of the explanatory statement by Detective Bates. At no point did Butler ever unambiguously or unequivocally request an attorney; rather, he knowingly and intelligently decided to make his statement without the benefit of counsel, although he was fully aware that he could choose not to give the statement at that immediate point in time, and choose instead to consult with counsel.
Butler cites this court's decision in State v. Gilliam, 98-1320 (La.App. 4 Cir. 12/15/99), 748 So.2d 622, as analogous to the instant case. In Gilliam, the sixteen-year-old juvenile Gilliam turned himself in accompanied by his mother. He and his mother signed a waiver-of rights form, waiving his rights. He was advised he would be charged with murder. As police began taking his recorded statement, he and his mother were asked if there was anything police could get them before the statement began. The following colloquy between the defendant and a police officer transpired:
A. I can get a lawyer now?
Q. I'm sorry?
A. I can get a lawyer now?
Q. You can get a lawyer if you want a lawyer. Do you want a lawyer?
A. Yea, can I get one now?
Q. Do you want a lawyer now? o.k.
A. Inaudible.
Gilliam, 98-1320, p. 5, 748 So.2d at 627.
The interrogation stopped at that point, and the defendant and his mother were left alone. Four minutes later, the commanding officer noted the statement had been concluded after a request by the defendant for an attorney, but that the defendant subsequently requested to go on with the interview, "not realizing that we didn't have any attorney present in the office." Police then specifically asked the defendant if he wished to give the statement without an attorney present. Gilliam replied, "Yes." Police asked the defendant if he understood that he did not have to give a statement, and he replied in the affirmative. The defendant's mother was asked whether she understood that her son did not have to give a statement, and was advised that police did not have an attorney available. She was further advised that they could stop the statement or *423 go on. The defendant's mother replied that they wished to go with the statement. The defendant subsequently gave an incriminating statement, and was later convicted of second degree murder.
This court reversed the trial court's denial of the motion to suppress, stating that in the case of a juvenile defendant accused of murder, serious questions about the voluntariness of his statement should be resolved against its voluntariness. This court's decision was based on a number of factors, primarily being that the defendant was a juvenile, and that he had unequivocally and unambiguously requested an attorney before later deciding to go ahead and give his statement. This court also inferred that the statement by police that no counsel was available could have caused the defendant to waive his right to counsel, stating "the clear inference from the facts is that had counsel been available, defendant would have continued to request that counsel be present for the statement." 98-1320, p. 17, 748 So.2d at 633.
Butler likens the instant case to Gilliam, noting Detective. Bates' instruction to him that if he wished to make a statement he had to say that he did not want an attorney. However, when asked by Detective Bates: "At this point in time would [sic] like to obtain an attorney?," Butler first said something inaudible, then clearly stated: "I can't get him now anyway." This was an equivocal statement by Butler indicating that he desired counsel. As previously noted, the U.S. Supreme Court held in Davis that "[i]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable police officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, the cessation of questioning is not required." Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994). "[T]he suspect must unambiguously request counsel.... `[A] statement either is such an assertion of the right to counsel or it is not.'" Id., quoting Smith v. Illinois, 469 U.S. 91, 97-98, 105 S.Ct. 490, 494, 83 L.Ed.2d 488 (1984) (brackets and internal quotation marks omitted). In Gilliam, the sixteen-year-old juvenile defendant unequivocally requested an attorney. Butler in the instant case was not a sixteen-year old juvenile, but a literate adult with a twelfth-grade education, and he did not unequivocally request an attorney.
Butler also draws an analogy between the instant case and State v. Coston, 98-0470 (La.App. 4 Cir. 9/16/98), 720 So.2d 714. However, Coston is also distinguishable. In Coston, when advised that he had a right to an attorney, the defendant asked an officer if that was so, why could he not get an appointed attorney to be present for the giving of the statement. The officer advised the defendant that it was 9:20 p.m. and the courts were not open. The defendant was asked if he had an attorney. He said he did not. He was asked if there was an attorney he could call who would come in to represent him, and the defendant replied that he did not know, but that he could call someone to get him an attorney. When the officer then asked the defendant if it was his wish that he have an attorney before giving a statement, the defendant replied, "Yes." The rights-of-arrestee form indicated that the defendant understood his rights, but the line for his signature contained the notation "refused," and a box was checked off indicating that he was undecided, and consequently was advised not to sign. One police officer testified that the defendant had waived his rights and given an oral statement before he requested an attorney. The district court denied the defendant's motion to suppress this statement, accepting the testimony of that officer. *424 This court reversed, finding that because it was impossible to determine whether the defendant had waived his right to counsel, the State had failed to carry its burden of proving a knowing and intelligent waiver. Coston is distinguishable on its facts from the instant case. The record before us indicates that Butler did not make an unambiguous/unequivocal request for an attorney.
Thus, considering the totality of the circumstances, he did not unequivocally invoke his right to counsel, but knowingly and intelligently waived that right and made the statement. The State met its burden of proving a knowing and intelligent waiver, and the district court properly denied his motion to suppress the recorded statement.
As to any statement by Butler to New Orleans Fire Department Investigator Raymond Washington, the investigator testified at the motion to suppress hearing and at trial that any statement Butler made as a result of his inquiries was made at the Seventh District Police Station after Butler had been advised of his Miranda rights by Detective Bates. The record is somewhat unclear as to whether Investigator Washington talked to Butler before Butler gave his taped statement, or rather talked to Butler before he gave the taped statement  but after being advised of his Miranda rights. The rights-of-arrestee form states a time of 3:48 a.m. The taped statement began at 4:38 a.m. However, as previously noted, the rights-of-arrestee form contains Butler's signature, noting that he understood the rights that had been read to him and that he was waiving them. Butler admitted in his taped statement that he had previously signed the rights-of-arrestee form, waiving his rights, with the intent of making a statement. Detective Bates testified at the motion to suppress hearing that Butler signed the form of his own free will, free of any force, intimidation or coercion. Detective Bates testified at the motion to suppress hearing that Butler turned himself in at the Seventh District Police Station about 3:30 or 4:00 a.m. The evidence indicates that Butler turned himself into police after 3:30 a.m., but before 3:48 a.m., the time on the rights-of-arrestee form. Investigator Washington was notified that a suspect had turned himself in, and the investigator relocated from the scene of the crime to the Seventh District Station. Detective Bates had advised Butler of his rights before Investigator Washington questioned him.
Considering the totality of the circumstances, any statement Butler gave to Investigator Washington was made after Butler was advised of his Miranda rights, and that he knowingly and intelligently waived them. The district court properly denied the motion to suppress as to any statement given to Investigator Washington.
There is no merit to this assignment of error.
In his second assignment of error, Butler offers a number of complaints regarding his sentence and the habitual offender proceeding.
He first argues that he was not arraigned on the habitual offender bill of information, and that he was not informed of the allegations contained therein at such arraignment, or of his right to be tried as to the truth thereof, all as his claims are required by La. R.S. 15:529.1(D)(1)(a). He further argues that, most importantly, the State did not provide him with the documentation in support of the habitual offender allegations at such arraignment, and he was only given that material on the day of the hearing. The record does not reflect that Butler objected to any of the *425 aforementioned deficiencies, and he waived any such objections when he announced to the court that he was ready to proceed with the habitual offender proceeding in court, following sentencing on the conviction of attempted manslaughter. Moreover, at the conclusion of the September 22, 2002 hearing, the district court permitted both sides two weeks to submit memorandums before the court made its ruling. The district court did not actually adjudicate Butler a fourth-felony habitual offender until March 19, 2004. Finally, while in one sentence in brief Butler argues that the failure of the State to turn over the documents evidencing the prior convictions deprived him of the opportunity to properly review them and respond to "any constitutional deficiencies," in the next sentence he concedes that his objections to the documents "are not of a constitutional nature." Indeed, he objected at the habitual offender ruling on March 19, 2004, only as to the sequencing of the prior arrest and convictions. There is no merit to any of these claims.
Butler also argues that he could not have been adjudicated a fourth-felony habitual offender because of the "sequencing" of his offenses and convictions. La. R.S. 15:529.1(A)(1) states in pertinent part that: "Any person who, after having been convicted within this state of a felony ... thereafter commits any subsequent felony within this state, upon conviction of said felony, shall be punished as [a second, third or fourth-felony habitual offender]." (Emphasis added). This provision means that defendant must have been convicted of the prior offense before he commits the subsequent offense in order to be adjudicated a habitual offender based upon that prior conviction. State ex rel. Mims v. Butler, 601 So.2d 649 (La.1992). The habitual offender adjudication and sentencing enhancement is predicated upon, in pertinent part, a defendant with a prior felony conviction being thereafter arrested for a subsequent felony offense, and thereafter convicted for that offense. Mims, supra.
In the instant case, the documents evidencing the prior convictions show that Butler was charged in Case # 355-042 with a number of counts of forgery that occurred in December 1991, but that he did not plead guilty to those offenses until April 12, 1996.
Butler was charged in Case # 400-104 with having issued a worthless check on March 17, 1995, and pleaded guilty to that offense on September 18, 1998.
Butler was charged in Case # 382-504 with issuing a worthless check on October 21, 1994, and pleaded guilty to that offense on May 1, 1996.
The instant offense occurred on March 11, 2002, and conviction followed.
Butler argues that he can only be adjudicated a second-felony habitual offender, based on one of the three convictions and the conviction in the instant case, because all three of the prior offenses occurred before he was convicted of any of the offenses. He submits that under La. R.S. 15:529.1(A)(1), and Mims, supra, in order to be adjudicated a fourth-felony habitual offender based on those three prior offenses, he would have had to have been convicted of one offense before committing the second, and convicted of the second offense before committing the third.
The State cites La. R.S. 15:529.1(B), which states:
B. It is hereby declared to be the intent of this Section that an offender need not have been adjudged to be a second offender in a previous prosecution in order to be charged as and adjudged to be a third offender, or that an offender has been adjudged in a prior prosecution to be a third offender in *426 order to be convicted as a fourth offender in a prosecution for a subsequent crime.
The State essentially argues that La. R.S. 15:529.1(B) means that a defendant can be adjudicated a fourth-felony habitual offender based on three prior convictions regardless of whether or not he was or even could have been adjudicated a second or third-felony offender based on those prior convictions. In State v. Everett, 2000-2998 (La.5/14/02), 816 So.2d 1272, cited by the State, the Louisiana Supreme Court rejected the argument by the defendant therein that under La. R.S. 15:529.1(B) a defendant "must have been susceptible to being successfully charged as and adjudged a second offender before he can be convicted as a third offender." Everett, 2000-2998, p. 16, 816 So.2d at 1282. The court stated that the defendant in Everett had cited no authority for such an interpretation of La. R.S. 15:529.1(B), and stated that it would apply the plain language of the statute as written. The court in Everett also rejected the argument that Mims bolstered his interpretation of La. R.S. 15:529.1(B), stating that the newly discovered minutes of a Louisiana House Committee hearing at which a 1982 amendment to La. R.S. 15:529.1(B) was discussed "calls into question the underpinnings of the Mims decision." Everett, 2000-2998, p. 18, 816 So.2d at 1283. The Everett court held that the defendant could be adjudicated a third offender notwithstanding the fact that he could not previously have been adjudicated a second offender because the so-called "cleansing period" of La. R.S. 15:529.1(C) in effect at the time of the commission of the defendant's second felony had elapsed at the time of that second felony. The court in Everett did not reach the issue of whether La. R.S. 15:529.1(B) should continue to be interpreted, as the court had held in Mims, as incorporating a sequential requirement for enhanced penalties in the sentencing of multiple offenders.
Recently, our Supreme Court reconsidered the validity of Mims based on the Everett dicta, in State v. Johnson, 2003-2993 (La.10/19/04), 884 So.2d 568. In Johnson, the defendant had three prior arrests: one in 1982, for armed robbery in which he received 20 years imprisonment at hard labor; one in 1993, for felony theft of an automobile; and a third in 1993, for attempted first degree robbery. As a result of these arrests, the defendant was adjudicated a third felony offender under the habitual offender statute.
At the hearing to determine the defendants habitual offender status, the state introduced evidence of the defendants prior convictions. Although the defendant did not contest the 1982 conviction, he challenged the district courts determination that the 1993 robbery conviction could be used to enhance his sentence under the multiple offender statute because it was entered on the same date as the felony auto theft conviction. The district court rejected the defendants argument and adjudicated him a fourth felony offender.
Relying on Mims, the Court of Appeal held that the two 1993 convictions, which were entered on the same date, lacked the proper "sequencing"[2] to constitute more than one offense for the purposes of the habitual offender statute. The habitual offender sentence was vacated and the case remanded to the district court with instructions for the State to select the predicate felony for which it wished to use *427 to enhance the defendants sentence. Subsequently, the State applied for supervisory writs.
The Supreme Court disagreed with the Court of Appeal and effectively overruled Mims and stated that "we do not think that it is necessary for the defendant to have been charged as a double offender in order that he might be charged as a triple offender. What is mandatory is that he has been tried and convicted of two previous offenses." Johnson at 572 (citing State v. Williams, 226 La. 862, 77 So.2d 515 (1955) at 516, quoting State v. Clague, 224 La. 27, 68 So.2d 746 (1953) at 747). The Court held:
[T]he habitual offender statute, LSA-R.S. 15:529.1, as it appears post-amendment, is clear and unambiguous. There is no statutory bar to applying the law in sentencing for more than one conviction obtained on the same date based on unrelated conduct. The statute simply does not contain a sequential conviction requirement. Rather, the only requirement in the statute is one which has been imposed from the inception: for sentence enhancement purposes, the subsequent felony must be committed after the predicate conviction or convictions. See, LSA-R.S. 15:529.1(A) ("Any person who, after having been convicted within this state of a felony ... thereafter commits any subsequent felony.").
Johnson at 578.
The Johnson holding, which effectively overrules Mims, is now controlling law in this state. Hence, multiple convictions obtained on the same date based on unrelated conduct can be counted separately, rather than sequentially for purposes of sentence enhancement under the habitual offender statute. Thus, the defendant in the Johnson case was subject to sentencing as a fourth offender, even though two of his prior convictions had been entered on the same date.
In the present case, all of Butler's three prior offenses occurred prior to the present conviction. Based upon the Johnson holding, Butler's three prior convictions count separately rather than sequentially, and he can be charged as a fourth felony offender based on the prior convictions. We find that the district court did not err in adjudicating Butler a fourth offender.
In his last assignment of error, Butler claims that his mandatory life sentence as fourth offender is excessive and points out the error patent in his being denied the right of parole. However, our above discussion renders this assignment of error moot.

DECREE
For the foregoing reasons, the conviction of Charles Butler is affirmed. Further, Mr. Butler's sentence as a fourth-felony habitual offender is also affirmed.
AFFIRMED.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Sequencing, for purposes of multiple offender sentencing is commission of a crime, followed by conviction, then commission of another crime, followed by a conviction and so forth.